*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0021p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

TUMBLEBUS INC.,

          *Plaintiff-Appellee,*

    *v.*

MEREDITH CRANMER, d/b/a Tumblebus of Louisville,

          *Defendant-Appellant.*

No. 04-5060

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00466—Charles R. Simpson, III, District Judge.

Argued: September 14, 2004

Decided and Filed: January 13, 2005

Before: MOORE and CLAY, Circuit Judges; HAYNES, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jack Allen Wheat, STITES & HARBISON, Louisville, Kentucky, for Appellant. James R. Higgins, Jr., MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee. **ON BRIEF:** Jack Allen Wheat, Bethany A. Breetz, STITES & HARBISON, Louisville, Kentucky, Samuel F. Miller, STITES & HARBISON, Nashville, Tennessee, for Appellant. James R. Higgins, Jr., Julie A. Gregory, Robert J. Theuerkauf, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Meredith Cranmer ("Cranmer"), d/b/a Tumblebus of Louisville, appeals from the district court's order granting Plaintiff-Appellee Tumblebus Incorporated's ("Tumblebus Inc.") motion for a preliminary injunction restricting Cranmer's use of the TUMBLEBUS mark and related trade dress during the pendency of the underlying infringement action. For the reasons set forth below, we **AFFIRM** in part, **VACATE** in part, and **REMAND** to the district court for further consideration of Tumblebus Inc.'s motion for a preliminary injunction.

---

[*] The Honorable William J. Haynes, United States District Judge for the Middle District of Tennessee, sitting by designation.

# I. BACKGROUND

In 1987, Brenda Scharlow ("Scharlow") launched Tumblebus Inc., a company which provides gymnastics and physical education instruction to children. Tumblebus Inc., which bills itself as a "mobile gym on wheels," furnishes such instruction on-site at day-care centers, birthday parties, and the like through the use of school buses retrofitted with gymnastics and other athletic equipment. Tumblebus Inc. currently operates three to four buses on a regular basis, marketing its services in the greater Louisville, Kentucky area.

Tumblebus Inc.'s business has also expanded to include the sale of retrofitted school buses to other persons wishing to enter the mobile-gymnastics-instruction market. Tumblebus Inc. has sold over two hundred retrofitted school buses to persons across the United States. Buses sold by Tumblebus Inc. seem to be similar in appearance to those used by Tumblebus Inc. in its own gymnastics-instruction business. Tumblebus Inc. permits purchasers to use the "Tumblebus" name when marketing their services, and many purchasers operate under names that include the word "Tumblebus." For approximately six years, Tumblebus Inc.'s training session for new bus purchasers has included a presentation by Donna Dugan ("Dugan"), owner of the Hot Fonts printing company, who offers for sale pre-designed letterhead, flyers, and other marketing materials containing the Tumblebus name and iconography.

According to Scharlow, Tumblebus Inc.'s expansion into selling retrofitted buses to other operators began somewhat informally, and the decision was made early on not to structure the business as a franchise because franchising would require too much on-site monitoring of individual franchisees' operations. Tumblebus Inc.'s record-keeping also appears rather informal, and according to Scharlow, Tumblebus Inc. does not have a complete list of all persons who have purchased retrofitted buses. Tumblebus Inc., however, has maintained contact with some purchasers, distributing new lesson plans and business development ideas.

In November 2001, Tara Pate ("Pate") purchased a retrofitted bus from Tumblebus Inc. When Pate first discussed her potential purchase with Scharlow, she indicated that she planned to operate in Lexington, Kentucky. Scharlow, however, informed Pate that two other persons were already operating in Lexington, but suggested that Pate could instead service Elizabethtown, Brandenburg, Mt. Washington, Bardstown, and Radcliff, Kentucky. According to Scharlow and her husband, Pate orally agreed to operate in this area but not to expand into Louisville, where Tumblebus Inc. was based. The Scharlows admit, however, that they forgot to put this agreement in writing. Testimony at the hearing also indicates that during a meeting between Pate, Pate's mother, and Scharlow, Scharlow refused to include a territory provision in Pate's purchase contract. When asked what would prevent Pate from operating in the Louisville area, Scharlow apparently responded that there would be nothing that she could do to stop Pate from soliciting customers in the Louisville area, but that she was confident in her customers' loyalty to Tumblebus Inc.[1]

In January 2002, Scharlow learned that Pate had distributed flyers advertising her business to day-care centers in the Louisville area. Scharlow contacted Pate, reminding Pate that she was not supposed to be operating in that area. Pate explained that she was having difficulty in obtaining customers in Elizabethtown and the surrounding areas, to which Scharlow responded that Pate could expand her operations into north Bullitt County, Kentucky, which included a day-care center that Tumblebus Inc. previously had serviced. Ultimately, however, Pate decided to leave the mobile-gymnastics-instruction market and listed her bus for sale in a Louisville newspaper.

---

[1] A few of Tumblebus Inc.'s sales contracts do include written geographic restrictions. According to Scharlow, she has "agreements with every person that buys a bus from [her], an oral agreement. But then it happens that some of the people on the east coast, they want it in written [sic]. They're a little less trustworthy, so the five [written agreements with geographic restrictions that were produced during discovery] were the five [she] had in writing." Joint Appendix ("J.A.") at 87 (D. Ct. Hr'g Tr. at 89).

Cranmer noticed Pate's advertisement in the Louisville newspaper and contacted Tumblebus Inc. in order to determine, for comparison purposes, what a newly retrofitted bus from Tumblebus Inc. would cost. Scharlow testified that when Cranmer called, she noticed that Cranmer's telephone number had a Louisville area code, so she asked Cranmer from where she was calling. When Cranmer explained that she was calling from Louisville, Scharlow apparently responded that she would not sell Cranmer a bus in Louisville because other Tumblebus operators were already in that area. Cranmer then stated that her sister was interested in purchasing a bus for operation in Bloomington, Indiana, and the discussion continued.

In April 2002, Cranmer purchased Pate's Tumblebus and began operating in the Louisville area under the name "Tumblebus." Upon learning that Cranmer was operating in Louisville, Scharlow contacted Cranmer. Cranmer and Scharlow discussed the possibility of Cranmer changing or adding something to the name of Cranmer's business, and Scharlow suggested such names as "Meredith's Tumblebus," "Fun Bus," and "Gym on Wheels." Cranmer eventually listed her business in the fall 2002 Louisville telephone book (with the same Louisville telephone number previously used by Pate) under the name "Tumblebus of Louisville." Tumblebus Inc. also appeared in the fall 2002 Louisville telephone book, but was listed after "Tumblebus of Louisville," appeared in smaller typeface, and included a New Albany, Indiana telephone number. Scharlow then began insisting that Cranmer remove the word "Tumblebus" from her business's name.

Scharlow claims that Tumblebus Inc. has suffered adverse consequences because of Cranmer's operation in the Louisville area. During the preliminary hearing, Scharlow recounted incidents in which customers apparently confused the two businesses, such as customers sending their payments to the wrong business and persons who had contracted with Cranmer telephoning Tumblebus Inc. when Cranmer failed to show up for scheduled appointments. According to Scharlow, Tumblebus Inc.'s income has declined as a result.

In July 2003, Tumblebus Inc. filed suit against Cranmer in the U.S. District Court for the Western District of Kentucky, accusing Cranmer of trademark infringement, trade dress infringement, and false advertising in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a), as well as trademark infringement, trade dress infringement, and unfair competition under Kentucky common law. Tumblebus Inc. then moved for entry of an order preliminarily enjoining Cranmer from using the TUMBLEBUS mark and associated trade dress. In December 2003, the district court held a hearing with respect to whether a preliminary injunction should issue, during which Scharlow, Scharlow's husband (Larry Scharlow), Cranmer, Pate, Pate's mother (Karen Morris), and Dugan testified. At the conclusion of the hearing, the district judge stated that he would grant Tumblebus Inc.'s request for a preliminary injunction with respect to Cranmer's use of the TUMBLEBUS mark in Jefferson County, Kentucky; Floyd County, Indiana; and Clark County, Indiana (collectively, the "greater Louisville area"). The district judge also indicated that he would enjoin Cranmer from using the TUMBLEBUS trade dress in the greater Louisville area, but stated that he would allow Cranmer time to decide whether she would continue to provide mobile-gymnastics services in the greater Louisville area (which would require physical alteration of the bus's appearance) or whether she would operate exclusively outside the greater Louisville area (in which case no change in the bus's exterior would be required).[2] In January 2004, the district court issued its preliminary injunction order, and Cranmer timely appealed to this court.

---

[2]In March 2004, during the pendency of this appeal, Tumblebus Inc. filed a motion requesting that the district court hold Cranmer in contempt of the preliminary injunction order for failure to alter adequately the exterior of her bus. The district court declined to hold Cranmer in contempt, but did set forth specific alterations Cranmer must make to the exterior of her bus.

## II.  ANALYSIS

### A.  Grounds For Obtaining A Preliminary Injunction

When considering a motion for preliminary injunctive relief, courts must balance:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003).  The preliminary question of whether a movant is likely to succeed on the merits is a question of law which we decide de novo. *N.A.A.C.P. v. City of Mansfield,* 866 F.2d 162, 169 (6th Cir. 1989).  We review for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief. *PACCAR*, 319 F.3d at 249; *N.A.A.C.P.*, 866 F.2d at 166 (noting that a "district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases") (internal quotation marks and citations omitted).  A district court has abused its discretion if it has "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *PACCAR*, 319 F.3d at 249 (internal quotation marks and citation omitted).

In granting Tumblebus Inc.'s motion for a preliminary injunction, the district court below concluded that Tumblebus Inc. had demonstrated a strong likelihood of success on its TUMBLEBUS mark and trade dress infringement claims, notwithstanding Cranmer's various asserted defenses; that Tumblebus Inc. faced irreparable harm in the absence of injunctive relief, based on the evidence of actual confusion and the financial losses already sustained by Tumblebus Inc.; that the injunction would not cause substantial harm to Cranmer because the injunction did not require Cranmer's business to cease operation; and that the public interest weighed in favor of injunctive relief because of the risk of confusion.  On appeal, Cranmer's central argument, and thus the focus of our inquiry, is that the preliminary injunction entered in this case cannot stand because Tumblebus Inc. has failed to demonstrate a strong likelihood of succeeding on the claims it asserts in this action. *See id.* at 249, 258; *see also Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999).

### B.  Likelihood Of Success On Lanham Act Mark[3] Infringement Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for infringement of marks and trade dress that have not obtained federal registration. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 921 (6th Cir. 2003); *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002).  When evaluating a Lanham Act claim for

---

[3]Both parties and the district court below have referred to the TUMBLEBUS mark as a "trademark."  We note, however, that because Tumblebus Inc. is challenging Cranmer's provision of mobile-gymnastics services under the TUMBLEBUS mark, and not her sale of retrofitted school buses, the term TUMBLEBUS would seem to be more appropriately labeled a "service mark" in the context of this suit. *Compare* 15 U.S.C. § 1127 ¶ 12 (providing that "[t]he term 'service mark' . . . [is used] to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown") *with* 15 U.S.C. § 1127 ¶ 11 (stating that "[t]he term 'trademark' . . . [is] used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown"); *see also Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054 (6th Cir. 1999) ("Rights to service marks are acquired and protected in the same way as rights to trademarks. Rights to trade names are also acquired and protected in the same way as rights to trademarks (and service marks).") (citation omitted).

infringement of an unregistered mark, courts must determine whether the mark is protectable, and if so, whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark.[4]

### 1. Existence Of A Protectable Mark

First, we must consider whether the district court erred in concluding that TUMBLEBUS is a protectable mark whose infringement can give rise to liability under § 43(a) of the Lanham Act. The protectability of the TUMBLEBUS mark depends on the level of the mark's distinctiveness. Suggestive,[5] arbitrary,[6] and fanciful[7] marks are inherently distinctive and are protectable so long as the putative owner has actually used the mark. *See Two Pesos,* 505 U.S. at 768; *Circuit City,* 165 F.3d at 1054-55. Merely descriptive marks[8] are not "inherently distinctive," but can become protectable by developing a secondary meaning.[9] Generic marks,[10] on the other hand, receive no protection. *See DeGidio v. West Group Corp.*, 355 F.3d 506, 510 (6th Cir.), *cert. denied*, 124 S. Ct. 2842 (2004). In the case at bar, the district court appears to have concluded that the TUMBLEBUS mark is protectable as a suggestive mark, a finding which we review for clear error.[11] *See id.* at 511.

---

[4] "Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (internal quotation marks and citations omitted).

[5] A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (internal quotation marks and citation omitted).

[6] "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (internal quotation marks and citation omitted).

[7] "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned, such as EXXON or KODAK." *Champions Golf Club,* 78 F.3d at 1117 (internal quotation marks and citation omitted).

[8] "A 'merely descriptive' mark, as opposed to a 'common descriptive' [generic] one, is often said to identify a characteristic of the thing. It is very similar to an adjective." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 n.7 (6th Cir. 2002), *cert. denied*, 538 U.S. 907 (2003).

[9] "To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?'" *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992) (internal quotation marks omitted). When determining whether a particular mark or trade dress has acquired a secondary meaning, we apply a seven-factor test which considers: "(a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 640 n.14 (6th Cir. 2002) (citations omitted). Merely descriptive marks that have been registered federally and that have become incontestable pursuant to 15 U.S.C. § 1065 are presumed to have acquired a secondary meaning. *See Nartron,* 305 F.3d at 404 n.7.

[10] "A generic term is one that is commonly used as the name of a kind of goods. Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species. If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark." *Nartron*, 305 F.3d at 404 (internal quotation marks and citations omitted).

[11] The district court's oral ruling on the question of the TUMBLEBUS mark's distinctiveness is admittedly a bit opaque; however, based on the district court's reference to actual use and its characterization of the mark as "unique," we conclude that the district court classified TUMBLEBUS as a suggestive mark, and not one that is merely descriptive. J.A. at 570-71.

Cranmer contends that Tumblebus Inc. is unlikely to succeed on the merits of its mark infringement claim because TUMBLEBUS is a generic term not entitled to Lanham Act protection. In Cranmer's view, the two constituent parts of TUMBLEBUS — "tumble" and "bus" — are generic terms that, when combined, are the most concise, easily understood way of referring to the services provided by Cranmer and Tumblebus Inc.[12] *See In re Gould Paper Corp.*, 834 F.2d 1017, 1019 (Fed. Cir. 1987) (concluding that the term "screenwipe" is generic, explaining that, "[The defendant] has simply joined the two most pertinent and individually generic terms applicable to its product, and then attempts to appropriate the ordinary compound thus created as its trademark. In this instance, the terms remain as generic in the compound as individually, and the compound thus created is itself generic.").

In support of her argument that TUMBLEBUS is a generic term, Cranmer cites Scharlow's testimony that TUMBLEBUS was a "natural" choice because Tumblebus Inc.'s business was "tumbling on a bus," and that TUMBLEBUS was "the most descriptive name [Scharlow] could think of." Joint Appendix ("J.A.") at 128 (Test. of Brenda Scharlow at 141). This statement by Scharlow, however, does not prove that TUMBLEBUS is in fact generic. First, Scharlow subsequently clarified during her testimony that the term "preschool gym on wheels" would be more descriptive of Tumblebus Inc.'s business than TUMBLEBUS. J.A. at 130-31 (Test. of Brenda Scharlow at 143-44). Moreover, many of the Tumblebus advertising materials, including those used by Tumblebus Inc., bear phrases such as "gym on wheels," which indicates that the term TUMBLEBUS alone has not been sufficient to convey the nature of Tumblebus Inc.'s services. J.A. at 220-21 (Tumblebus Inc. letterhead including subtitles "mobile gym on wheels" and "A bus filled with fun equipment bringing fitness to children at daycares, elementary and private schools"); J.A. at 226 (Tumblebus Inc. business card including subtitle "A Gym on Wheels"). Thus, we conclude that the district court did not clearly err in finding that TUMBLEBUS is not a generic term incapable of obtaining protected status.

Moreover, upon consideration of the record before us, the district court's apparent categorization of TUMBLEBUS as a suggestive, rather than merely descriptive, mark is not clear error. The line between merely descriptive and suggestive marks is admittedly hazy and can be difficult to discern. *See DeGidio*, 355 F.3d at 510 n.10. Nevertheless, the TUMBLEBUS mark shares a closer kinship with those marks previously designated as suggestive than those labeled merely descriptive because of the degree of inferential reasoning necessary for a consumer to discern that the TUMBLEBUS mark relates to the provision of on-site gymnastics and fitness instruction to children. *See Induct-O-Matic Corp. v. Inductotherm*, 747 F.2d 358, 362 (6th Cir. 1984) (explaining that a suggestive mark "requires the observer or listener to use imagination and perception to determine the nature of the goods") (internal quotation marks and citations omitted). Although the word "tumble" does describe a subset of the activities which occur inside Tumblebus Inc.'s "bus," the connection between "tumble" and "bus" is not so obvious that a consumer seeing TUMBLEBUS in isolation would know that the term refers to mobile-gymnastics instruction, and not, for instance, a mobile laundry service using tumble-dryers. Again, the fact that Tumblebus Inc. has found it necessary to include explanatory phrases such as "gym on wheels" in its advertising materials indicates that the term TUMBLEBUS does not merely describe the services provided by Tumblebus Inc. As a result, we conclude that the district court did not clearly err in classifying TUMBLEBUS as an inherently distinctive, suggestive mark.

---

[12]Cranmer also appears to suggest that TUMBLEBUS has become generic through the sale of Tumblebuses across the country, such that the term TUMBLEBUS has become synonymous with the provision of mobile-gymnastics services. *See Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 667 (7th Cir. 1965) (collecting cases involving such terms as "aspirin" and "cola" that have been victims of "genericide," a process by which terms lose their significance as indicators of origin as a result of widespread public usage). The evidentiary record before us, however, provides little guidance as to any evolving public understanding of the term TUMBLEBUS, and thus we cannot conclude at this time that the term TUMBLEBUS has become generic.

### 2. Likelihood Of Confusion

To recover on a claim of mark infringement, a mark's owner must establish not only that the mark is protectable, but also that use of the mark by the opposing party is likely to cause confusion. When evaluating the likelihood of confusion, a district court must balance the following factors:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; [and]
8. likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916 (1982) (internal quotation marks and citation omitted). On appeal, we review for clear error the district court's findings of fact with respect to each of the *Frisch* likelihood-of-confusion factors, but we "review *de novo* the legal question of whether those foundational facts constitute a 'likelihood of confusion.'" *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir. 1996).

Cranmer does not appear to challenge the district court's likelihood-of-confusion determination, and testimony elicited at the evidentiary hearing, as well as Cranmer's interrogatory responses, indicate that Cranmer's and Tumblebus Inc.'s customers have actually confused the two businesses, misdirecting payments and telephone inquiries. We conclude that the TUMBLEBUS mark's relative strength as a suggestive mark and the record evidence of actual confusion weigh in favor of finding a likelihood of confusion, and that, based on the record before us, none of the other *Frisch* factors militate against such a finding. *See id.* at 1116-17 (explaining that "[a] suggestive term is considered stronger than one that is merely descriptive," albeit not as strong as an arbitrary or fanciful mark); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) (noting that "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion"). Thus, Tumblebus Inc. has made a sufficient showing of likely confusion to sustain entry of a preliminary injunction with respect to the TUMBLEBUS mark.

### 3. Asserted Defenses

#### a. Abandonment Of Rights In A Mark Through Naked Licensing

Cranmer argues that Tumblebus Inc. is unlikely to succeed on the merits of its mark infringement claim because Tumblebus Inc. has abandoned any rights it might have to the TUMBLEBUS mark through "naked licensing." Title 15 U.S.C. § 1127 provides that:

> [a] mark shall be deemed "abandoned" . . . [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

One method by which a mark may be abandoned is through "naked licensing," which occurs "[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee," such that "the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that are under the control of the owner of the mark" and the mark can no longer provide "a meaningful assurance of quality." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 cmt. b (1995).

According to Cranmer, Tumblebus Inc.'s pattern of allowing its purchasers to use the term "Tumblebus" in their businesses has resulted in the TUMBLEBUS mark losing its significance in the greater Louisville area. The record before us, however, contains insufficient evidence for us to conclude that Cranmer's defense of abandonment is so strong as to make it unlikely that Tumblebus Inc. will succeed on the merits of its trademark infringement claim. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075-76 (5th Cir.), *cert. denied*, 522 U.S. 915 (1997) ("Because naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent."). First, based on the testimony presented at the evidentiary hearing, it is unclear whether the relationship between Tumblebus Inc. and the purchasers of its buses with respect to the TUMBLEBUS mark is most aptly categorized as a license, a consent-to-use agreement, or neither. *See* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:79 (4th ed. 2004) ("In a license, the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license. In that event, quality control is essential. . . . A consent agreement does not require quality control because by the very essence of the agreement, the parties recognize that concurrent usage does not lead customers to link the goods or services of the parties. Whereas a license brings the parties together into a common public image and a joint enterprise, a consent agreement keeps the parties apart at a defined distance.").

Moreover, Cranmer's abandonment defense lacks force because it relies on abandonment of the TUMBLEBUS mark in other parts of the United States to effectuate a forfeiture of Tumblebus Inc.'s rights to the mark in the greater Louisville area.[13] In support of her abandonment defense, Cranmer asserts that, in creating the Lanham Act, Congress recognized the need for nationalization of trademark law in light of the increasing nationalization of trade and commerce. Arguably, some of our prior decisions have suggested that a junior mark-user's operation in a different geographic region from the senior mark-user might not, by itself, foreclose the senior mark-user's claim for infringement against the junior user. *See Circuit City,* 165 F.3d at 1056-57 (Jones, J., concurring); *Champions*, 78 F.3d at 1121-22. These cases would be turned on their heads, however, if we were to conclude that, because trademark rights may extend beyond the particular geographic area in which a business operates, a trademark holder may also lose any rights it has in a mark anywhere in the United States by abandoning the mark in one part of the country or by failing to establish a mark with national significance.

Indeed, contrary to Cranmer's suggestion otherwise, there is considerable support for the concept that rights in a mark may be abandoned in certain geographic areas but not others (i.e., "partial geographic abandonment"). *See Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124-25 (5th Cir. 1973); *E. F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 522 (6th Cir. 1943), *cert. denied*, 321 U.S. 763 (1944) ("While a trade-mark extends to every market where the trader's goods have become known and identified by his use of the mark, the mark itself cannot travel to markets where the trader does not offer, or has not offered, the articles for sale. Such permission for use north of the Ohio river, would be a naked license and void, resulting in an abandonment by Prichard of any rights to the mark *in that area*.") (emphasis added) (citations omitted); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 30 cmt. a ("Priority at common law . . . extends only to the geographic areas in which the trademark owner uses the designation or in which the designation is associated with the trademark owner. Common law priority *in a particular geographic area* is thus lost if the designation has been abandoned by the owner in that geographic area.")

---

[13]In raising this argument, Cranmer places much emphasis on Professor McCarthy's oft-repeated phrase that "abandonment opens rights to the whole world." 2 MCCARTHY ON TRADEMARKS § 17:1. Cranmer's reliance on this phrase, however, is misplaced because it takes the phrase out of context and, as a result, misconstrues its meaning. Courts have spoken of abandonment as effectuating a loss of trademark rights vis-à-vis "the whole world" in order to distinguish the defense of abandonment, which prevents a mark holder from asserting a claim against *any* infringer, from the defense of acquiescence, in which a mark owner loses the ability to enforce his or her rights against a *particular* infringer. *See* MCCARTHY, *supra* ("Once held abandoned, a mark falls into the public domain and is free for all to use. While acquiescence may bar suit against one person, abandonment opens rights to the whole world. Abandonment paves the way for future possession and property in any other person.").

(emphasis added) (citation omitted); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 cmt. b ("If substantial uncontrolled use is confined to a particular geographic or product market, a court may conclude that the mark has been abandoned only in that geographic area or in connection with use on that product. The trademark owner then retains its priority in the use of the mark in other areas or on other products.").

In the end, we must return to the statutory mandate of § 1127, which provides that abandonment occurs when a term "lose[s] its significance as a mark." So long as the TUMBLEBUS mark retains its significance in the greater Louisville area, we fail to see why Tumblebus Inc. should be foreclosed from asserting its rights in the TUMBLEBUS mark in that market. *See Exxon*, 109 F.3d at 1079-80 ("[I]f a trademark has not ceased to function as an indicator of origin there is no reason to believe that the public will be misled; under these circumstances, neither the express declaration of Congress's intent in subsection 1127(2) nor the corollary policy considerations which underlie the doctrine of naked licensing warrant a finding that the trademark owner has forfeited his rights in the mark."). Given the lack of evidence in the record suggesting that the TUMBLEBUS mark has in fact lost its significance in the greater Louisville area, we conclude that the district court did not err in determining that Tumblebus Inc. is likely to succeed on its mark infringement claim notwithstanding Cranmer's asserted defense of abandonment.

### b. "First-Sale" Defense

Cranmer also argues that Tumblebus Inc. is unlikely to succeed on the merits of its mark infringement claim because the exhaustion (or "first-sale") defense insulates Cranmer from liability. The first-sale doctrine provides that "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir.), *cert. denied*, 516 U.S. 914 (1995); *see also PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 257 (6th Cir. 2003). This is true because, when a retailer merely resells a genuine, unaltered good under the trademark of the producer, the use of the producer's trademark by the reseller will not deceive or confuse the public as to the nature, qualities, and origin of the good. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24 cmt. b.

The first-sale doctrine does not apply in the case at bar, however, because Cranmer is not using the TUMBLEBUS mark to resell a genuine good produced by Tumblebus Inc., but rather is using the mark to promote her own mobile-gymnastics service. Unlike goods, which can be sold and resold without change to their nature, quality, and genuineness, services such as gymnastics and fitness instruction inherently vary depending on who is providing such services. Even assuming Cranmer and Tumblebus Inc. use identical retrofitted school buses when providing their gymnastics and fitness-instruction services, other factors, such as the quality of instructors and lesson plans, necessarily distinguish the services provided by the two companies, such that the public could be confused as to what qualities the TUMBLEBUS mark embodies. *See PACCAR*, 319 F.3d at 257 ("The first sale doctrine offers no defense when the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees.") (internal quotation marks and citation omitted); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1023-24 (2d Cir. 1989) (allowing first-sale defense in trademark infringement suit on the basis that customers knew that purchases from the defendant included the product only and not its installation, which plaintiff's authorized distributors provided). Thus, Cranmer's assertion of the first-sale defense does not render it unlikely that Tumblebus Inc. will prevail on the merits of its mark infringement claim.

### c. Unenforceability Of Contractual Territory Restrictions

Cranmer next contends that Tumblebus Inc. is unlikely to succeed on the merits of its claims because the purported oral territory restriction entered into by Pate and Tumblebus Inc. is unenforceable under antitrust laws and the statute-of-frauds provision in the Kentucky Business Opportunities Act, Ky. Rev. Stat. § 307.801 *et seq.* Such an argument is misplaced, however, because Tumblebus Inc.'s ability to recover

against Cranmer for mark infringement does not depend on the existence of a valid and enforceable territory restriction in Tumblebus Inc.'s sales contract with Pate.

### d. Accord And Satisfaction

Finally, we reject Cranmer's contention that Tumblebus Inc. is not likely to succeed on the merits of its claims because the affirmative defense of accord and satisfaction shields Cranmer from liability. *See Bowater North Am. Corp. v. Murray Mach., Inc.*, 773 F.2d 71, 75 (6th Cir. 1985) ("An accord and satisfaction is a method of discharging a contract or settling a cause of action arising either from contract or tort by substituting for such contract or cause of action an agreement for the satisfaction thereof and the execution of such substituted agreement."). We question whether the parties reached a meeting of the minds such that an accord was entered, for Cranmer seems to assert that her obligation was simply to add another word in addition to "Tumblebus" in her business's name, whereas Scharlow claims that she requested that Cranmer change her business's name such that it would be distinct from that of Tumblebus Inc. Even if Tumblebus Inc. and Cranmer did reach an accord, such an agreement does not seem to furnish a defense in this case because the rights and obligations asserted under the alleged accord would simply mirror those asserted by Tumblebus Inc. in its mark infringement suit. Thus, Cranmer's assertion of an accord-and-satisfaction defense does not make it unlikely that Tumblebus Inc. will succeed on the merits of its mark infringement claim.

## C. Trade-Dress Infringement

In addition to enjoining Cranmer's use of the TUMBLEBUS mark, the district court's preliminary injunction order also provides that Cranmer is prohibited from "using the vehicle color markings and color scheme of plaintiff (*i.e.*, the 'TUMBLEBUS trade dress') on any vehicle used for Ms. Cranmer's mobile gymnastics business" and that Cranmer must "remove indicia of the TUMBLEBUS trade dress from her bus" when it is operated in the greater Louisville area. J.A. at 603-04 (D. Ct. Preliminary Injunction Order at 2-3). Cranmer asserts that this portion of the district court's preliminary injunction cannot stand because the district court failed to make the requisite findings on the record necessary to sustain such an order. We agree.

While a district court may, in appropriate cases, preliminarily enjoin the use of a particular trade dress pending adjudication of a trade-dress-infringement claim, we cannot affirm the entry of such an order unless the injunction "set[s] forth the reasons for its issuance," is "specific in terms," and "describe[s] in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." FED. R. CIV. P. 65(d); *see Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 360 (6th Cir. 1998).

To recover for trade-dress infringement under § 43(a) of the Lanham Act, a party must first identify what particular elements or attributes comprise the protectable trade dress. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 634 (6th Cir. 2002) ("[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list.") (internal quotation marks and citation omitted). Then, the party must show by a preponderance of the evidence that its trade dress is distinctive in the marketplace, that its trade dress is primarily nonfunctional, and that the defendant's trade dress is confusingly similar to the party's protected trade dress. *Id.* at 629. In the case at bar, the district court failed to make any findings on the record as to what particular aspects of Tumblebus Inc.'s vehicular design qualify as distinctive trade dress that is primarily nonfunctional and confusingly similar to Cranmer's vehicular design, thus hampering our ability to review whether Tumblebus Inc. is likely to succeed on the merits of its trade-dress infringement claim and what particular trade-dress usage should be enjoined. Thus, we vacate the district court's preliminary injunction order to the extent that it relates to the issue of trade dress and remand to the district court for further factfinding on the record as to whether Tumblebus Inc. is likely to succeed on the merits of its trade-dress-infringement claim.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's preliminary injunction order as it relates to Cranmer's use of the TUMBLEBUS mark, we **VACATE** the district court's preliminary injunction order as it relates to Cranmer's use of the TUMBLEBUS trade dress, and we **REMAND** for further proceedings consistent with this opinion.