[Cite as *Bedford Auto Dealers Assn. v. Mercedes Benz of N. Olmsted*, 2012-Ohio-927.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97080**

# BEDFORD AUTO DEALERS ASSOCIATION

PLAINTIFF-APPELLANT

vs.

# MERCEDES BENZ OF NORTH OLMSTED, ET AL.

DEFENDANTS-APPELLEES

## JUDGMENT:
## AFFIRMED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-697071

**BEFORE:**  Boyle, P.J., Sweeney, J., and Keough, J.

**RELEASED AND JOURNALIZED:**  March 8, 2012

**ATTORNEY FOR APPELLANT**

John F. Burke, III
Burkes Law, LLC
614 West Superior Avenue
Rockefeller Building, Suite 1500
Cleveland, Ohio    44113

**ATTORNEYS FOR APPELLEES**

**For Mercedes Benz of North Olmsted**

James B. Niehaus
Kelly Johnson
Frantz Ward
127 Public Square
2500 Key Center
Cleveland, Ohio    44114

**For Ganley Westside Imports, Inc., et al.**

A. Steven Dever
13215 Detroit Avenue
Lakewood, Ohio    44107

MARY J. BOYLE, P.J.:

{¶1} Plaintiff-appellant, Bedford Automobile Dealers Association ("Bedford Dealers Association " or "Association"), appeals from a judgment of the Cuyahoga County Common Pleas Court granting summary judgment to defendants-appellees, several automobile dealers located on Lorain Road in North Olmsted ("North Olmsted dealers"). The Association raises four assignments of error for our review. All of the assignments, however, relate to whether the trial court erred when it granted summary judgment to defendants. After a de novo review of the law and facts, we find no error on the part of the trial court and affirm.

<u>Procedural History and Factual Background</u>

{¶2} The background facts in this case are undisputed. The Bedford Dealers Association formed in the mid 1950s. Membership to the Association is limited to new car dealers located within the Bedford Automile. The Bedford Automile is approximately a one-mile stretch of road in Bedford, Ohio, near the intersection of Broadway Avenue and Rockside Road, comprising of these new car dealerships.

{¶3} The Association began using the term "automile" sometime between the mid 1950s and mid 1960s, but did not register it as a trade name with the state of Ohio until 1987. According to Michael Lally, whose father, Tim Lally, helped found the Association, the Association's purpose is to market the Bedford Automile "as being an area with several automobile dealerships within a mile that people can shop at very

conveniently." He explained that the Association's membership dues are primarily used to pool advertising dollars to promote the goodwill and trade name "automile."

**{¶4}** In 2008, a group of automobile dealers (defendants-appellees) in North Olmsted began advertising as the "North Olmsted AutoMile." One of the defendant dealers registered "North Olmsted Auto Mile" as a fictitious name with the state of Ohio in the fall of 2008. When the Bedford Dealers Association learned that appellees were using automile in their advertising, it immediately demanded they stop using the term. But the North Olmsted dealers refused to do so.

**{¶5}** Subsequently, the Bedford Dealers Association filed an action against the North Olmsted dealers in June 2009, alleging that defendants committed Ohio common law trademark infringement and deceptive trade practices. It alleged that the North Olmsted dealers appropriated the trade name "automile," causing confusion to consumers in the northeastern Ohio automobile market. It claimed that "the natural and probable consequences of the use of that trade name are to mislead, deceive, or confuse the public into believing that there is an identity, affiliation, or relationship between" the Bedford Dealers Association and the North Olmsted dealers. The Association sought an injunction, as well as compensatory and punitive damages.

**{¶6}** The North Olmsted dealers moved for summary judgment, arguing, inter alia, that the Bedford Dealers Associations' claims should fail because the term "automile" is a "generic term used to describe a group of car dealers located within close

geographic proximity." The trial court agreed, and granted the North Olmsted dealers' motion. It is from this judgment that the Association appeals, claiming the trial court erred in doing so. Although the Association raises four assignments of error for our review, they all raise the same issue, i.e., whether the trial court erred when it granted summary judgment to defendants. Thus, we will address the assignments of error together.

## Standard of Review

{¶7} Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. This rule was reaffirmed by *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 448, 663 N.E.2d 639 (1996):

> Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Parsons v. Fleming*, 68 Ohio St.3d 509, 511, 628 N.E.2d 1377 (1994), citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶8} As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments by the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

## Analysis

{¶9} The basic principles governing trademarks and trade names are the same, and the rights in a trade name, as well as the right to protection thereof, arise as a matter of common law. *Younker v. Nationwide Mut. Ins. Co.*, 175 Ohio St. 1, 191 N.E.2d 145 (1963).

{¶10} In *Patio Enclosures, Inc. v. Borchert*, 8th Dist. No. 40592, 1980 WL 354611, *2 (May 15, 1980), this court explained the history and policy behind common law trademark law:

> At common law, the general rule was that a party was entitled to protection against the use, by another, of its established trade name and trademark in such manner as to mislead the trade and the public to believe that when they are dealing with one, they are dealing with the other, or in such manner that such use results, or may result, in appropriation of the good will, a property right of the other. There are two fundamental purposes for the laws protecting interests in a trade name or trademark. First, such laws are designed to protect the public. Because consumer purchasing is frequently based on name buying, such name must be protected to assure the purchaser that he is receiving the goods from the source on which he relies. Secondly, it is the purpose of the law to safeguard the interest of the owner of the name or mark in the goodwill he has created, by keeping another merchandiser or producer from infringing on the goodwill created as to the name or mark. (Citations omitted.)

{¶11} The Bedford Dealers Association's second claim stems from the Ohio Deceptive Trade Practices Act and is based upon R.C. 4165.02(A)(2) and (3). Generally, the Ohio Deceptive Trade Practices Act is a codification of the common law. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1431 (S.D.Ohio 1990). This statute provides in relevant part:

> A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person * * *

\* \* \*

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another[.]

**{¶12}** Further, this statute is substantially similar to Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), also known as the Trademark Act of 1946. *Dawson v. Blockbuster*, 8th Dist. No. 86451, 2006-Ohio-1240, 2006 WL 1061769, ¶ 23, citing *Yocono's Restaurant, Inc. v. Yocono*, 100 Ohio App.3d 11, 17, 651 N.E.2d 1347 (9th Dist.1994). Thus, claims for common-law trademark infringement under Ohio law and for violations of the Ohio Deceptive Trade Practices Act are subject to the same standards as their federal counterparts under the Lanham Act. *Id.* And "[w]here claims are made under the Ohio common law and the deceptive trade practices statutes, [Ohio] courts are to apply essentially the same analysis as that applied in assessing [the law of] unfair competition under the federal statutes." *Id.*, citing *Cesare v. Work*, 36 Ohio App.3d 26, 520 N.E.2d 586 (9th Dist.1987).

**{¶13}** "The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). In determining whether a likelihood of confusion exists, a court will typically weigh the following eight

factors: (1) strength of the senior mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the intent of defendant in selecting the mark, and (8) likelihood of expansion of the product lines. *Id.*, citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir.1982); *see also Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 694 (6th Cir.2003).

**{¶14}** In applying these factors, the Sixth Circuit Court of Appeals has cautioned that they "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991). Given the fact-specific nature of trademark infringement actions, not all of the eight factors will be relevant in every case. *Id.* In every case, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*

**{¶15}** But the likelihood of confusion analysis also involves a preliminary question: whether the mark is entitled to trademark protection. *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir.2008). If not, then the trademark infringement laws, along with the eight-factor analysis, do not even apply. *See Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*, 240 F.3d 251, 255 (4th Cir.2001) (because court determined that "crab house" was generic, there was no need to address

the likelihood of confusion test).

**{¶16}** Not every word, name, symbol, or device qualifies as a protectable mark; rather, it must be proven that it performs the job of identification, i.e., to identify one source and to distinguish it from other sources. If it does not do this, then it is not protectable as a trademark. *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915, 923 (6th Cir.2003), citing J. Thomas McCarthy, *McCarthy On Trademarks And Unfair Competition*, § 3:1 (2002).

**{¶17}** Indeed, only those marks that are "distinctive" as a matter of law are accorded trademark protection. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir.2002). Certain marks, described as "arbitrary," "fanciful," or "suggestive" are "inherently distinctive" and protectable (like Apple computers or Nike shoes). *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). On the other hand, marks that identify a characteristic of a thing are "descriptive" marks, which are very similar to an adjective. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir.2005). Marks that are descriptive are not inherently distinctive but may enjoy the benefit of protection if they develop a "secondary meaning." *Two Pesos* at 769; *Tumblebus* at 761. A descriptive mark achieves secondary meaning when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, fn.

11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

{¶18} But a generic mark refers to the genus or class of which a particular product is a member, and thus can never be protected. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir.2000). Because they serve primarily to describe products rather than identify their sources, generic terms are incapable of becoming trademarks, at least in connection with the products that they designate. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193-194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). A generic term, such as "car" or "pizza," is one that does not have capacity as a source-identifier because it designates the class or genus of goods. *See Abercrombie*, 537 F.2d at 9; *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir.2007) (a generic term does not distinguish the goods of one producer from the goods of others; it is one that either by definition or through common use has come to be understood as referring to the genus of which the particular product is a species). Rather than answering the question "Where do you come from?"— a generic term merely explains "What are you?" *Id.*, citing 2 *McCarthy*, *supra*, § 12:1.

{¶19} Awarding trademark rights to any user of a generic term, especially the first user, would harm competitors and consumers alike. Competitors unable to use a common term that describes or designates their product are at a significant disadvantage communicating to potential customers the nature and characteristics of the product. *See* Vanessa Bowman Pierce, *If it Walks like a Duck and Quacks like a Duck, Shouldn't it be*

*a Duck?: How a "Functional" Approach Ameliorates the Discontinuity Between the "Primary Significance" Tests for Genericness and Secondary Meaning*, 37 N.M.L.Rev. 147, 154 (2007). Likewise, consumers will be forced either to pay a higher price to purchase the desired goods from the seller who owns the generic term as a trademark or expend additional time investigating the alternative products available. *Id.* Therefore, in accord with the primary justifications for protecting trademarks — to aid competition and lower consumers' search costs — the law does not grant any party exclusive rights to use generic terms as trademarks.

**{¶20}** In deciding whether a mark is generic, evidence of the relevant public's understanding of a term "may be obtained from any competent source." *In re Merrill, Lynch, Pierce Fenner & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed.Cir.1987). This evidence may include purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications. *Id.*

**{¶21}** The North Olmsted dealers attached evidence to their summary judgment motion establishing that there are 34 other automiles in the United States and abroad, including two others in southern Ohio. Because of this, they argue that "automile" is a generic term referring to a group of automobile dealers located in close geographic proximity, rather than one particular entity. We agree.

**{¶22}** We find this case to be strikingly similar to *Boston Duck Tours*, 531 F.3d 1. In 1994, Boston Duck Tours began offering sightseeing tours of the Boston area using

genuine, renovated DUKWs from World War II; amphibious army vehicles used in the war to function as both trucks and boats. The company received national and international press coverage as well as numerous awards for its tours. The company's logo featured a cartoon duck in water. In 2007, Super Duck Tours began providing sightseeing tours in Boston by land and water using custom-made amphibious vehicles called Hydra-Terras. The company's logo also featured a cartoon duck in water. Boston Duck Tours sued Super Duck Tours in federal district court for federal trademark infringement.

{¶23} The First Circuit Court of Appeals found "duck tours" to be generic. *Id.* at 7-8. The court found that articles in the media and other third-party sources use the phrase "duck tours" generically to refer to amphibious, sightseeing tours. *Id.* at 19. The court cited two Boston Globe articles that used "duck tours" generically, and explained these "articles from Boston join many others from around the country which use 'duck tours' in a generic manner." (Citations omitted.) *Id.* The court further cited evidence of other companies around the country that provided the same amphibious sightseeing services. According to the record, there were at least 36 other "duck tour" companies in the United States and the world. And "[o]f those 36 tour companies described in the record, 32 include the term 'duck' in their company or trade name, and more than 10 use both the terms 'duck' and 'tour(s)' in their trade name." *Id.* at 19. "Taken together, this

evidence indicates that when consumers hear the term 'duck tours,' they associate it primarily with a product rather than a source." (Citations omitted.) *Id.* at 19-20.

**{¶24}** The First Circuit Court concluded that granting Boston Duck exclusive rights to use the phrase in the Boston area "would be to erect a barrier of entry into the marketplace, thereby preventing other entities, such as Super Duck, from calling their product by its name." *Id.* at 22. It further reasoned that "Super Duck, as well as other potential competitors, would be placed at a significant market disadvantage." *Id.* at 21.

**{¶25}** The present case is also analogous to *Hunt Masters*, 240 F.3d 251. In *Hunt Masters*, an operator of a restaurant named the "Charleston Crab House" brought a trade name infringement action against Landry's Seafood Restaurant, a company that was intending to open "The Crab House" in the same area. Landry argued that "crab house" was a generic term referring to a class of restaurants that serve crabs. The Fourth Circuit Court of Appeals agreed, explaining:

> This court recently confronted a nearly identical factual scenario. See [*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir.2000)]. In that case, a corporation operating numerous "Ale House" restaurants brought suit seeking to enjoin another corporation from opening a facility named the "Raleigh Ale House." Id. at 140. This court concluded that the plaintiff had no protectable interest in the term "ale house" because the term is generic. Id. at 141. In concluding that "ale house" is generic, the court rejected the argument that "ale house" might be generic in some applications, such as English pubs, but non-generic when applied to facilities serving both food and beer. Id.; see also *Maine Ave. Seafood v. The Crab House, Inc.*, Civil Action No. DKC 97-640 (D.Md. Mar. 30, 1998) (holding that "crab house" is generic and use of "The Crab House" did not infringe upon the rights of the nearby "Bethesda Crab House").

Application of the Ale House analysis here compels the conclusion that "crab house" is generic as well. In determining whether a mark is generic, courts should not parse terms to determine that they are made up of generic components. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1530 (4th Cir.1984). However, the principle that a mark must be considered as a whole to determine its validity does not preclude courts from considering the meaning of individual words in determining the meaning of the entire mark. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir.1986). Here, the meaning of the individual words is fairly clear. A crab is "any of numerous chiefly marine broadly built crustaceans," while "restaurant" is one of the many definitions of the word "house." Webster's New International Dictionary 1096 (3d ed.1961). Other common words that are often used as synonyms for "restaurant" include bar, parlor, and shop. When preceded by a type of food, these words describe various classes of restaurants, such as ale houses, tapas bars, ice cream parlors, and coffee shops. Each term denotes a class of restaurant serving a particular type of food, just as "crab house" denotes a class of restaurant that serves crabs. (Footnote omitted.) *Hunt Masters* at 254.

**{¶26}** The *Hunt Masters* court further noted that an Internet search revealed a multitude of "crab houses" across America, which demonstrated that Hunt Masters' use of the term was not original or unique. *Id.* (Referencing at least ten other locations in the country using "crab house" in the name of its restaurant.)

**{¶27}** Here, we agree with the North Olmsted dealers that "automile" is a generic term that is not entitled to trademark protection. They submitted evidence establishing the existence of automiles in Allentown, Pennsylvania; Raynham, Massachusetts; Johnston, Iowa; Fairfax, Virginia; Norwood, Massachusetts; New Smyrna Beach, Florida; Auburn, California; Indianapolis, Indiana; Charleston, South Carolina; Langley, British Columbia; Alberta, Canada; St. Louis, Missouri; Murray City, Utah; Portland, Maine; and many others in the United States and abroad.

**{¶28}** The North Olmsted dealers also attached evidence of third parties, namely, newspapers and magazines, using the term "automile" generically to describe a group of automobile dealers located in a geographic proximity. For example, in June 2009, The Akron Beacon Journal likened a "ring of donut shops" to "the car dealers who like to be all together on an auto mile." Powell, *Doughnut shops ring city circle: Dunkin franchise to fill vacancy not far from Jubilee in Tallmadge*, The Akron Beacon Journal (June 10, 2009). This is just one example of many third-parties' generic use of the term "automile" — locally and nationally — that the North Olmsted dealers attached to their summary judgment motion.

**{¶29}** The Association argues that "automile" as owned by it "has come to have its own definition in northeast Ohio," and has therefore, "acquired a secondary meaning." The Association points to its exclusive use in northeast Ohio for decades, as well as its extensive advertising over the years, as evidence that "automile" has "acquired secondary meaning" in northeast Ohio.

**{¶30}** In *Demetri's Family Restaurant, Inc. v. Brown*, 8th Dist. No. 47921, 1984 WL 6329, *2 (Dec. 6, 1984), this court explained:

Secondary meaning is a meaning beyond the trade name itself. Secondary meaning arises when a trade name becomes uniquely associated with the services rendered or the products sold under the name. That sense of association-with, of meaning beyond the name, is difficult to create and easy to lose. Judge Learned Hand called it the "penumbra" of meaning that builds up around the original name, enhancing and transforming it as a symbol. *Landers, Frary & Clark v. Universal Cooler Corp.*, 85 F.2d 46 (1936). Once this secondary meaning attaches to a trade name, its first or senior user gains a proprietary interest that can be protected against junior users.

**{¶31}** But "[u]nder no circumstances is a generic term susceptible of de jure protection under ¶ 43(a) of the Lanham Act, 15 U.S.C. 1125(a) or under the law of unfair competition." *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 7-8 (1st Cir.1981). The *Miller Brewing* court explained the following rationale for the rule:

> No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name. The reason is plain enough. To allow trademark protection for generic terms, i.e. terms which describe the genus of goods being sold, even when these have been identified with a first user, would grant the owner of the mark a monopoly since a competitor could not describe his goods as what they are. (Citations omitted.) *Id.*

**{¶32}** The Bedford Dealers Association further argues that the North Olmsted dealers' use of "automile" causes consumer confusion as to whether the North Olmsted dealers are somehow associated with the Bedford Dealers Association. But as we stated previously, if a mark or name is not entitled to trademark protection, such as a generic term, then we need not get to the likelihood of confusion test. *Hunt Masters*, 240 F.3d at 255 (because the court determined that "crab house" was generic, there was no need to address the likelihood of confusion test). Thus, whether consumers in northeast Ohio are confused as to whether the North Olmsted dealers are somehow affiliated with the Bedford Dealers Association is irrelevant.

**{¶33}** The Association also contends that the trial court considered unauthenticated, hearsay evidence attached to the North Olmsted dealers' summary

judgment motion, namely, Internet searches regarding the use of "automile" throughout Ohio, the United States, and abroad. We disagree. Attorneys for the North Olmsted dealers authenticated the exhibits to the trial court. This was sufficient for purposes of summary judgment. *See Kassouf v. White*, 8th Dist. No. 75446, 2000 WL 235770 (Mar. 2, 2000) (relying on Evid.R. 901(A), this court held that trial court did not err when it considered web-based evidence attached to summary judgment motion when materials were authenticated by an affidavit).

{¶34} Accordingly, the Bedford Dealers Association's four assignments of error are overruled.

{¶35} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

JAMES J. SWEENEY, J., and
KATHLEEN ANN KEOUGH, J., CONCUR