**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0691n.06

**No. 10-4202**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TRI-COUNTY WHOLESALE DISTRIBUTORS, INC.; THE BELLAS COMPANY, dba Iron City Distributing, | ) ) ) ) | **FILED** *Jun 29, 2012* LEONARD GREEN, Clerk |
| Plaintiffs - Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| v. | ) ) | SOUTHERN DISTRICT OF OHIO |
| THE WINE GROUP, INC., | ) ) | OPINION |
| Defendant - Appellant. | ) ) | |

Before: KETHLEDGE and STRANCH, Circuit Judges; GWIN, District Judge.[*]

**JANE B. STRANCH, Circuit Judge**. This is an interlocutory review of a preliminary injunction that stops Defendant The Wine Group ("TWG"), a California-based national wine supplier, from terminating distributorship agreements with the Plaintiffs, two franchisees who are the exclusive distributors of certain TWG products in several Ohio counties. We find no abuse of discretion in the district court's determination that the factors collectively weigh in favor of granting the preliminary injunction. We **AFFIRM**.

**I. BACKGROUND**

Like many other states, Ohio has a three-tier system for distributing alcoholic beverages: Manufacturers supply products to distributors, who in turn supply products to retailers for sale to the

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

public. Ohio Alcoholic Beverages Franchise Act ("Franchise Act" or "Act"), Ohio Rev. Code Ann. § 1333.82, *et seq.*; *see Granholm v. Heald*, 544 U.S. 460, 466-68 (2005) (reviewing three-tier model). Manufacturers must contract with distributors through a franchise agreement. Ohio Rev. Code Ann. § 1333.83. Distributors are granted exclusive rights to distribute specific brands within their territories, creating localized monopolies over specific products. *Id.* § 4301.241.

TWG is the third largest wine manufacturer in the United States. Its best known brands include Franzia, Paul Masson, Almaden, and Inglenook. For the past several decades it has distributed some, but not all, of its wine products under exclusive franchise agreements for various Ohio counties with Tri-County Wholesale Distributors, Inc. and the Bellas Company d/b/a Iron City Distributing (collectively "Wine Distributors"). TWG distributes other wine products through other distributors in the counties serviced by the Wine Distributors. Similarly, the Wine Distributors distribute wines (and other products) from other manufacturers besides TWG. TWG's wines constitute twenty percent and seven percent of wine sales made by Tri-County and Iron City, respectively.

On July 2, 2010, TWG sent the Wine Distributors separate notices that it was terminating their franchises under Ohio Rev. Code Ann. §§ 1333.84 and 1333.85, effective September 6, 2010.[1] The Termination Notices explained that "TWG has concluded that it is in the best interest of the company to consolidate all brands owned, licensed and/or imported by TWG and distributed by

[1] Termination letters were also sent to Glazer's Distributors of Ohio, Inc., and the Hammer Company, both Ohio distributors that appeared as plaintiffs in the action below. Those letters contained identical termination explanations, but included additional grievances specific to the underlying business relationships. Both companies have settled all claims against TWG and neither joined this appeal.

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

Tri-County Distributing with one distributor in the State of Ohio."[2]  Terminating the Wine

Distributors' franchises was "part of an on-going nationwide plan of reorganization of TWG's

distribution network in order to more effectively and efficiently manage" certain product lines in

Ohio and nationally.  In particular, the Termination Notices referred to Ohio's mandatory mark-up

pricing system.  That system requires wine distributors to mark up products by no less than thirty-

three percent, guaranteeing significant profit margins to distributors and placing the burden on

manufacturers to remain price-competitive.  Ohio Admin. Code 4301:1-1-03(C)(2)(b).  Reducing

distribution redundancies, the Termination Notices explained, provides "the best opportunity for

TWG to reduce costs and thereby maintain and possibly reduce prices to the great benefit of

consumers in the State of Ohio."

The Termination Notices described specific factors contributing to TWG's termination

decision, including shipping to four distribution outlets rather than twelve, an enhanced focus on a

single distributor's sales team, better use of its sole Ohio sales representative, the elimination of

redundant brand presentations among multiple distributors, consolidated pricing negotiations,

diminished overhead in handling customer service and invoicing among multiple distributors, and

increased focus and coordination of statewide brands and priorities.  In effect, TWG said that it could

reduce its costs by dealing with only one Ohio distributor and could increase sales because that

distributor had better experience with major retail chains.

After receipt of the Termination Notices, the Wine Distributors filed a diversity action

requesting declaratory and permanent injunctive relief under the theory that TWG's proposed action

---

[2]The letters differ only in the distributor recipients designated.  For convenience, we refer to
the Tri-County Termination Notice.

would violate the Franchise Act. They also filed motions for a preliminary injunction to enjoin TWG from terminating the franchise agreements during the pendency of the action. The district court granted the Wine Distributors' motion for a preliminary injunction, finding that TWG was unlikely to satisfy the "just cause" termination requirement of the Franchise Act, the Wine Distributors adequately demonstrated irreparable harm, no party would be in a worse position by maintaining the status quo, and the public interest would be benefitted by an injunction. *Tri-Cnty. Wholesale Distribs., Inc. v. The Wine Grp., Inc.*, No. 2:10-cv-693, 2010 WL 3522973, at *8 (S.D. Ohio Sept. 2, 2010). TWG filed this interlocutory appeal on the basis that the district court erred in its findings and abused its discretion in weighing those findings in favor of granting the injunction.

## II. DISCUSSION

### A. Standard of Review

When considering an appeal concerning a preliminary injunction, we review the district court's factual findings for clear error and its legal conclusions, including whether the movant is likely to succeed on the merits, de novo. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007). The district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed under a "highly deferential" abuse of discretion standard. *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (quoting *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007)).

## B. Injunctive Relief under the Ohio Alcoholic Beverage Franchise Act

As a threshold matter, TWG asks this Court to find that the Franchise Act forbids entry of a preliminary injunction and allows only monetary damages for a violation. We agree with the district court that the Franchise Act does not prohibit a court from issuing a preliminary injunction:

> The Franchise Act contemplates suits for "damages or *other relief*." Ohio Rev. Code § 1333.87 (emphasis added). Moreover, numerous courts have issued injunctions preserving the rights of distributors under the Franchise Act until the merits could be fully litigated, a fact that presumably has not escaped the Ohio General Assembly's notice. *See, e.g.*, *InBev USA LLC v. Hill Distrib. Co.*, No. 2:05-cv-298 (S.D. Ohio Mar. 31, 2005) (granting temporary restraining order); *Esber Beverage Co. v. Labatt USA Operating Co.*, No.2009CV03142 (Stark Cty. Ohio Com. Pl. Dec. 1, 2009) (granting preliminary injunction).

*Tri-Cnty.*, 2010 WL 3522973, at *2. The Ohio Court of Appeals quoted this very language and wrote: "We agree. Based upon the language of R.C. 1333.87, we find the trial court did not err in granting injunctive relief." *Esber Bev. Co. v. Heineken USA, Inc.*, No. 2011CA00033, 2011 WL 5626592, at *5 (Ohio Ct. App. Nov. 14, 2011).

## C. Preliminary Injunction Factors

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration*, 511 F.3d at 542 (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Given this limited purpose, a party seeking a preliminary injunction "is not required to prove his case in full" under the same procedures and evidentiary requirements that would apply at a trial on the merits. *Id.* (same). Courts consider four factors when deciding whether to grant a preliminary injunction under Federal Rule of Procedure 65:

(1) whether the movant has a strong likelihood of success on the merits;
(2) whether the movant would suffer irreparable injury without the injunction;
(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of the injunction.

*Id.* (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "These four considerations are 'factors to be balanced, not prerequisites that must be met.'" *Id.* (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)).

### 1.      Likelihood of Success on the Merits

For the first factor, we ask whether the Wine Distributors have a strong likelihood of success on the merits under the Franchise Act. We apply Ohio law when considering this question. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Certified Restoration*, 511 F.3d at 541. Because the Ohio Supreme Court has not squarely answered the questions presented here, we must "predict how it would rule, by looking to 'all available data,' including state appellate decisions." *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 499 (6th Cir. 2007) (quoting *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001)). We should not disregard decisions of the Ohio appellate courts unless "we are presented with persuasive data that the [Supreme Court of Ohio] would decide otherwise." *Medlen v. Estate of Meyers*, 273 F. App'x 464, 470 (6th Cir. 2008) (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)); *see McFadden v. Cleveland State Univ.*, 896 N.E.2d 672, 676 (Ohio 2008) (quoting Ohio Sup. Ct. R. Rep. Op. 4(B) ("All court of appeals opinions . . . may be cited as legal authority and weighted as deemed appropriate by the courts.")); *cf. Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 257 n.1 (6th Cir. 2011) (noting that decisions of the Michigan intermediate courts are binding authority under Michigan law).

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

The Franchise Act prohibits manufacturers from terminating a franchise "for other than just cause." Ohio Rev. Code Ann. § 1333.85. The Franchise Act does not define "just cause." Both sides of this dispute cite to cases that they argue support their positions. The Wine Distributors point us to *Dayton Heidelberg Distributing Co. v. Vintners International Co. of New York*, in which the court held that "just cause must mean something more than a manufacturer's unilateral determination that it could make more money if a franchise were terminated." No. C-3-87-436, 1991 WL 1119912, at *8 (S.D. Ohio Apr. 8, 1991); *see also Tri-Cnty. Distrib., Inc. v. Brown Forman Bev. Co.*, No. 91 C.A. 225, 1993 WL 150297, at *3 (Ohio Ct. App. May 4, 1993) (holding that termination of distributorship for reasons not related to distributor's performance lacked just cause). TWG relies chiefly on *Superior Beverage Co. v. Schieffelin & Co.*, which held that just cause "only requires bare business judgment" and that wrongdoing is sufficient, but not necessary, to meet this standard. Nos. 1:05 CV 0834, 4:05 CV 0868, 2007 WL 2756912, at *6 (N.D. Ohio Sept. 20, 2007).

We disagree with TWG's argument that these competing cases, which the district court observed to be "irreconcilable," *must* preclude a determination that the Wine Distributors are likely to succeed on the merits. In the absence of a definitive determination by the Ohio Supreme Court, our task is to predict how that court would rule in this case. *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). Sometimes this task is difficult, but here it appears to be easy: The Ohio Court of Appeals recently issued a decision in a case between TWG and another recipient of the Termination Notice in which the court expressly held that the district court's order in this case, "and its reliance upon *Vintners*, is more persuasive than *Schieffelin*." *Esber Bev. Co. v. Wine Grp., Inc.*,

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

No. 2011CA00179, 2012 WL 983194, at *5 (Ohio Ct. App. March 19, 2012).[3]   While this

interlocutory appeal of a preliminary injunction requires us to merely predict whether the Wine

Distributors are likely to succeed on the merits, *Esber* was an appeal of a declaratory judgment in

which the merits were actually reached. *Id.* at *1.  The *Esber* court concluded: "[U]nder the analysis

and reasoning in *The Wine Group* and *Vintners* as to the meaning of just case, reasonable minds can

only conclude that TWG's business reasons for terminating the franchise were not just cause." *Id.* at

*6.

We find no persuasive reasons why the Ohio Supreme Court would reach a different result.

The plain language of the Franchise Act states that "just cause" may not be constituted by "[a]

unilateral alteration of the franchise by a manufacturer for a reason *unrelated to any breach* of the

franchise or violation of [two statutes]."  Ohio Rev. Code Ann. § 1333.85(B)(3) (emphasis added).

As the district court observed, "*Vintners* gives effect to § 1333.85(B)(3), whereas *Schieffelin* does

not." *Tri-Cnty.*, 2010 WL 3522973, at *4.[4]  Similarly, TWG, relying heavily on *Schieffelin*, makes

no attempt to account for this provision.  Looking directly at the Franchise Act, we have little trouble

concluding that the Wine Distributors have a strong likelihood of success on the merits because the

Termination Notices do not suggest any breach or statutory violation but rather appear to implicate

precisely the type of conduct implicated by § 1333.85(B)(3).  *See Vintners*, 1991 WL 1119912, at

*9 ("[S]ubsection (B)(3) prohibits importers from terminating distributorships simply for purposes

---

[3]The Wine Distributors submitted this decision to the Court in a Federal Rule of Appellate Procedure 28(j) letter after oral arguments were held.  TWG has not responded.

[4]The district court also noted that the cases relied upon in *Schieffelin* do not support its conclusion "because all of the decisions involved some manner of deficient performance by the distributor." *Id.*

of restructuring an existing franchising network, as Vintners did here, absent a breach of duty by the franchisee.").[5]

Although TWG cautions us from an "unnecessary . . . review of the merits," *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., Inc.*, 753 F.2d 1354, 1356 (6th Cir. 1985), the factor at issue contemplates a weighing of the parties' chances at trial by inquiring as to the *likelihood* of success, rather than its mere possibility. Sometimes this consideration will yield a clear answer even if one court has reached the opposite conclusion. *See Certified Restoration*, 511 F.3d at 543-50 (reversing district court's assessment of this factor after finding non-compete covenant was unambiguous under state law). In fact, this Court has affirmed the issuance of a preliminary injunction based *only* on this factor upon concluding that the moving party had a "near certainty" of success on the merits. *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 315 (6th Cir. 1998).[6] Although we conclude that the Wine Distributors appear to have a near certainty of success on the merits due to *Esber* and the deference which the district court must provide, we will continue to assess the remaining factors. We also note that, despite these assessments, our conclusions of law are not binding at trial on the merits. *Certified Restoration*, 511 F.3d at 542 (quoting *Camenisch*, 451 U.S. at 395).

---

[5]Having reached this result, we need not reach the question of whether TWG's proposed termination would also violate § 1333.85(B)(2), which provides that "restructuring, other than in bankruptcy proceedings, of a manufacturer's business organization" is also not just.

[6]Contrary to the dissent's suggestion, we see no indication in *Mascio* that (1) the likelihood of success was the only factor challenged on appeal or (2) that district courts are not required to consider each factor correctly. In any event, our holding does review all four factors and then balances them in making the determination that the district court did not abuse its discretion.

### 2.       Irreparable Injury

In the second factor of the preliminary injunction analysis we consider whether the Wine Distributors would suffer irreparable injury without the injunction. Such harm must be "likely," not just possible. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration*, 511 F.3d at 550 (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.* (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

> The district court found the Wine Distributors demonstrated irreparable harm:
>
> TWG's products comprise a significant portion of Plaintiffs' sales. Moreover, Plaintiffs have promoted and distributed TWG's beverages for decades. It is therefore reasonable to infer that Plaintiffs have acquired substantial good will in connection with their distribution of TWG's products, which include, in TWG's own words, "several unique, high velocity wines."

*Tri-Cnty.*, 2010 WL 3522973, *8. We find no error in this analysis. The loss of a product which is "unique"—a classification effectively conceded by TWG in its Termination Notices—can cause a drop in customer goodwill. *See Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). "[T]his court has recognized that a loss of business goodwill may constitute irreparable harm because of the difficulty in calculating damages." *Langley v. Prudential Mortg. Capital Co., LLC*, 554 F.3d 647,

649 (6th Cir. 2009) (citing *Basicomputer Corp.*, 973 F.2d at 512). Thus, the district court did not abuse its discretion in holding that the Wine Distributors will likely suffer an irreparable injury.[7]

### 3.     Substantial Harm to Others

The third factor we must consider is whether substantial harm to others will occur if the injunction is granted. The district court weighed this factor in favor of the Wine Distributors because, although a preliminary injunction would "deny or at least delay the benefits TWG hopes to reap as a result of the . . . consolidation plan," it would only maintain the status quo and would not place TWG, or any other party, "in a worse position than they were in before the injunction." *Tri-Cnty.*, 2010 WL 3522973, at *8. TWG does not challenge this finding.

### 4.     Public Interest

The final factor is whether the public interest would be served by granting injunctive relief. The district court found that this factor supported an injunction as well because "giving effect" to Ohio laws and "preserving jobs" benefits the public. *Id.* It gave less weight, but did not completely dismiss, TWG's position that the lower costs made possible by its proposal would benefit consumers: "Given the unique nature of alcoholic beverages, which are a blessing to many, but a curse to more than a few, the Court feels less strongly that knocking a quarter off the price of MD 20/20 would provide a measurable benefit to the public." *Id.*

---

[7]Even if we agreed with the dissent's well-reasoned conclusion that the district court abused its discretion in finding irreparable injury, this would not end the inquiry. As the dissent recognizes, the four factors are not preconditions and the "district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" is a different inquiry that must be independently reviewed under a "highly deferential" abuse of discretion standard. *Certified Restoration*, 511 F.3d at 541.

TWG challenges this conclusion. But there is no dispute that the statute the distributors seek to enforce is one that the Ohio legislature passed through the ordinary democratic process. The Franchise Act therefore represents the legislature's judgment that enforcement of the statute is in the public interest. *See Golden Gate Rest. Ass'n v. City and Cnty. of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948.4 (2d. ed. 2012) ("The public interest may be declared in the form of a statute").

Courts in Ohio have recognized that the Franchise Act was directly intended to create the very results which TWG now claims to be against the public interest. *See Esber Bev. Co.*, 2012 WL 983194, at \*4 (noting that the possibility of a manufacturer getting "locked into an unprofitable situation" has been determined by the Ohio legislature to be "a business risk which must be assumed by all manufacturers of alcoholic beverages which avail themselves of the rights and privileges of marketing their wares in Ohio" (citation and internal quotation marks omitted)); *see also Bev. Distribs., Inc. v. Miller Brewing Co.*, 803 F. Supp. 2d 765, 777-78 (S.D. Ohio 2011) ("The just cause requirement for terminating a franchise agreement is intended to protect the franchisee from this type of arbitrary and potentially coercive act." (citation and internal quotation marks omitted)).

We will not second-guess the legislature here because TWG makes no argument that the statute is unconstitutional or even that the statute undermines the public interest. *See F.D.I.C. v. Jeff Miller Stables*, 573 F.3d 289, 301 (6th Cir. 2009) ("[O]ur role is to apply Ohio's resolution of this public policy question, not to second guess the determination."). The district court did not abuse its discretion in holding that it is in the public interest to enforce the Franchise Act in this case.

**D.** **Balancing the Preliminary Injunction Factors**

Upon finding that all of the factors supported the Wine Distributors, the district court naturally concluded that the factors collectively weighed in favor of granting a preliminary injunction. *Tri-Cnty.*, 2010 WL 3522973, at *8. Similarly, we hold the court did not abuse its discretion in weighing the factors in favor of granting the preliminary injunction. *See Certified Restoration*, 511 F.3d at 541-42.

**E.** **Sealed Documents**

Having reviewed the analysis of Section IV of the dissent, we are inclined to agree that the parties' stipulated protective order was overly broad and improperly entered. Because the matter was not fully presented to this court, we remand the issue for consideration by the district court.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of the preliminary injunction.

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

JUDGE JAMES S. GWIN, Northern District of Ohio (concurring and dissenting in part).

I agree with much of Judge Stranch's reasoning. First, the majority correctly finds that Ohio law allows the issuance of equitable relief in these beverage distributor cases. Second, Judge Stranch is correct that plaintiffs show a strong likelihood of success on their Franchise Act claim that TWG's desire to streamline its Ohio distribution structure does not amount to just cause for terminating the franchises. Nevertheless, I disagree that the Wine Distributors have shown sufficient evidence of irreparable injury. Because I believe that injunctions should be disfavored, especially where there has been no discovery or development of the evidence, and the district court's clearly erroneous finding of irreparable harm left it unable properly to balance the four requisite preliminary injunction factors, I would find the district court abused its discretion in issuing a preliminary injunction.

Deploying "one of the most drastic tools in the arsenal of judicial remedies," *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985), the district court determined that the Wine Distributors were likely to suffer irreparable injury from the loss of TWG product lines before the district court could hold a trial on the merits. The district court found irreparable injury likely without saying which products would, if lost, trigger irreparable injury during the pendency of the litigation, without examining whether the distributors could substitute other franchised products, and without any persuasive explanation why money damages could not remedy any improper franchise cancellation.

Under certain conditions, and upon specific evidentiary showings, a movant distributor can prove that a particular product, in a particular market, is so fundamental to her business that the lost product would cause irreparable damage to her customers' goodwill. *Ross-Simons of Warwick, Inc.*

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

*v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Yet here, nothing supports such a finding. The district court should have required the Wine Distributors to show "both certain and immediate, rather than speculative or theoretical" harm. *Mich. Coalition of Radioactive Material Users, Inc v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). They did not, and the district court should not have issued the preliminary injunction.

The district court based its finding of irreparable injury on an idle boast in TWG's termination letter that several of its product lines are "unique." However, as the term is generally used, it would be difficult to find less "unique" products than the commodity brands commonly associated with TWG, wines whose principal identifying feature is that grocers and wine stores sell them in cardboard boxes with taps to facilitate longtime storage. Though uniqueness, even of TWG's cardboard-clad brands, might have been credibly asserted with appropriate evidence demonstrating some unique endowment with consumer goodwill, no such showing was made here. No particular brands that might exercise some unique or outsized and incalculable influence in the marketplace were even identified. By excusing the perfunctory, speculative nature of the Wine Distributors' irreparable injury arguments, the majority minimizes the necessary showing of irreparable injury. Because a district court abuses its discretion when it imposes a pre-trial injunction based on a clearly wrong determination of irreparable harm, I would vacate the preliminary injunction.

I.

Given the Ohio General Assembly's adoption of special-interest legislation guaranteeing distributors outsized profits at the consumers' expense, the majority correctly finds that the wine

distributors showed a likelihood of success on their claim that TWG ended their franchises without just cause. Still, the mere likelihood of success does not warrant a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In deciding whether to jump into a dispute before any discovery has occurred, a court should grant preliminary injunctive relief only if equitable relief is necessary to stave off irreparable harm "pending final hearing." *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940). Courts should first decide whether interim relief is necessary lest ultimate relief would become moot. Under circumstances such as these, particularly where a party has demanded a jury trial, a district court must "act with caution and restraint." *Day v. Video Connection*, 602 F. Supp. 100, 103 (N.D. Ohio 1982).

The district court, however, did not exercise caution or restraint. The affidavits supporting the Wine Distributors' motions for preliminary injunctions were vague and conclusory. Although they bore the burden to prove certain and immediate harm, the Wine Distributors referred only to "certain TWG brands" and provided no evidence that ending the franchise on these particular products might have amounted to irreparable injury. Their affidavits refer to "the TWG brands at issue" and, in nearly identical and equally conclusory language, prophesy "immediate and irreparable injury to [their] business and reputation[s] that cannot be compensated by money damages." Despite these doomsday pronouncements, the motions and the affidavits left the district court without any facts upon which it could plausibly find anything but a speculative threat of irreparable harm.

Irreparable harm can result from franchise cancellations where a particular product has an outsized impact on a distributor's business model and the distributor shows that the loss of that product line will erode customer goodwill and cause incalculable injury. *Baccarat*, 102 F.3d at 19. Still, this does not excuse a movant from its burden to give testable evidence that the particular product exercises that unique influence, *id.*, or that any associated goodwill will be lost in the absence. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d. Cir. 1995) (distinguishing unquantifiable harm from merely speculative harm).

The Wine Distributors could have carried their burden in two ways. First, they could have offered specific evidence that particular TWG products were unique in ways that would affect the sale of other products that the Wine Distributors distributed. After showing that the loss of some franchise would directly affect other sales, the Wine Distributors could have argued that the associated lost sales of other products were unquantifiable and would cause irreparable injury pending trial unless the parties' franchise relationship was frozen. Alternatively, the Wine Distributors could show irreparable harm by showing that they had imbued the franchised products with the franchisee's goodwill, and that goodwill would be forfeited to their successor distributor to the Wine Distributors' irreparable detriment. The Wine Distributors made no such showings.

## A.

The majority correctly acknowledges that the loss of a unique product "can cause a drop in customer goodwill." But "the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."

*Baccarat*, 102 F.3d at 19. The district court, however, based its irreparable harm determination on some unproven uniqueness of brands that the distributors never even identified.

Although TWG boasted in its termination letters that several of its high-velocity wines are "unique," the plaintiff distributors offered no evidence to show which brands were involved or that they are unique in ways that implicate—let alone demonstrably jeopardize—customer goodwill. "The fact that a bottle or type of wine is unique does not mean that the loss of the right to sell that wine causes unmeasurable harm." *Excello Wine Co. v. Monsieur Henri Wines, Ltd.*, 474 F.Supp. 203, 210 (S.D. Ohio 1979) (expressing skepticism that any franchise termination would impair any relationships with retailers). Nor does the fact that a unique product might enjoy a prominent national reputation establish that the loss of the product would cause irreparable injury. *Caral Corp. v. Taylor Wine Co.*, No. C-1-80-215, 1980 U.S. Dist. LEXIS 17753, at *15 (S.D. Ohio July 15, 1980) ("If that were so, no franchise in any field involving a well known product could ever be terminated without an irreparable damage question and that simply cannot be so.").

To show irreparable injury, a movant must present evidence that a product is unique in ways that involve customer goodwill and threaten irreparable harm. When compared with the evidence here, the irreparable-injury finding in *Baccarat* enjoyed overflowing evidentiary support. Still, the First Circuit considered irreparable injury a "close question." In contrast to this case, the *Baccarat* franchisee showed evidence that the Baccarat crystal brand was an integral component of the movant's business model, that customers relied on the availability of the Baccarat brand instead of other comparable products, and that the line served as "a beacon to attract potential customers."

*Baccarat*, 102 F.3d at 19. Baccarat, in short, carried its burden to show evidence necessary to support the potential loss of consumer goodwill and the threat of irreparable injury.

The Wine Distributors offered no such evidence. First, nothing suggests that any of the TWG products are not fungible within the market for high-velocity wines. For the deprivation of a supposedly "unique" product to threaten irreparable harm, a movant must make some meaningful showing that another comparable product cannot seamlessly replace the jeopardized brand. *Baccarat*, 102 F.3d at 19 ("Ross-Simons could not simply replace the Baccarat line with some other brand."); *Hill Distrib. Co. v. St. Killian Imp. Co., Inc.*, No. 2:11-CV-706, 2011 WL 3957255, at *5 (S.D. Ohio Sept. 7, 2011) ("There is not currently a brand available that could fill the void."). The characterization of unspecified products as unique "does not end our inquiry" because the inability to obtain a particular product "does not of itself show that 'nothing can answer the justice of the case but the performance of the contract *in specie*. . . .'" *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 764 (3d Cir. 1971). Trademarked items may be unique, but to the customer may also be wholly fungible with a competitor's similar item.

Nonetheless, on fungibility, the Wine Distributors say only that within the distribution industry (which they do not further illuminate) "it is very unlikely that [the Wine Distributors] would be able to find a comparable wine product to distribute in place of the TWG brands." Certainty and imminence this is not; conclusory speculation this very much is. There is simply no evidence to suggest that the "certain TWG wines" to which the Wine Distributors vaguely refer, however trivially unique they may be, cannot be replaced by equally quaffable alternatives.

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

Moreover, courts must analyze irreparable injury stemming from terminated product lines within particular markets and as to particular products. *Baccarat*, 102 F.3d at 21. Consumer goodwill is not simply sales volume, but whether consumer goodwill is implicated turns on the role and significance of a particular brand within a distributor's portfolio. *Compare Dayton Heidelberg v. Vineyard Brands*, 108 F. Supp. 2d 859 (S.D. Ohio 2000) (loss of specific brands did not cause irreparable injury from lost customer goodwill despite testimony suggested that customers had come to expect the brands' availability because the wines were an insignificant portion of total sales and other brands could replace those wines), *with Esber Bev. Co. v. Labatt USA Op. Co.*, No. 2009CV03142 (Ohio Ct. Com. Pl. Dec. 1, 2009) (finding irreparable injury threatened by loss of beer supplier's line that accounted for 90% of a distributor's products). Where a product is without unusual significance, "it is doubtful that any relationships with retail outlets would be impaired." *Excello*, 474 F. Supp. at 210.

The Wine Distributors failed to show that the elusive TWG products play a significant enough role in their portfolio to implicate customer goodwill or threaten irreparable injury. Though the district court found that TWG products were a significant portion of the Wine Distributors' sales, that finding is clearly incorrect because the evidence only establishes that the TWG products comprise a significant portion of its customers' total *wine* sales. It does nothing to illuminate the significance of TWG products within the Wine Distributors' portfolios for the purposes of customer goodwill; wine may be only a small portion of their customers' orders.[8] There was insufficient

_____

[8]We call the movants in this case "Wine Distributors" for convenience because the termination notices suggest that certain high velocity wine products are at issue, but we have no evidence to show the proportion of different alcoholic beverages represented in their businesses. For all the Court is aware, "Beer Distributors" may be the more accurate term. In 2010, beer accounted

evidence to suggest that particular TWG products play a sufficiently pivotal role in the Wine Distributors' portfolios, or in their customers' expectations and purchasing decisions, to threaten irreparable injury.

B.

Another way that the Wine Distributors could have shown irreparable injury from the loss of customer goodwill would have been to show that their promotional efforts added to the products at issue. Customer goodwill reflects the value-addition that a *distributor* gives the product, and a distributor's investment in good relations with grocers, convenience stores, off-licenses, and bars could result in greater sales of the franchise products. However, this goodwill is separate and distinct from the goodwill otherwise associated with the product itself. Budweiser will sell huge amounts of beer no matter who distributes it. Likely, distributors have only marginal impact on the product quantities sold. As a result, it is not clear that the terminated distributors will lose any significant goodwill that the district court could not otherwise compensate with a legal remedy.

Nonetheless, the Wine Distributors could have shown a threat to their earned goodwill—as distinct from that inherent in their products—by showing that they sell greater quantities of the products than comparably-situated distributors sell in other areas. If the Wine Distributors had shown that they sell more of the franchised products they could plausibly argue that this relative success would flow to the new franchisee. They could have shown that their efforts resulted in goodwill-enhanced wine sales that the replacement distributor would irreparably capture. For

---

for 50% of beverage industry market share while wine accounted for only 17%. *See* Distilled Spirits Council, Industry Review Support Tables – 2010, *available at* http://www.discus.org/pdf/Spirits_Category_Tables_2010.pdf (last visited May 8, 2012).

example, if the Wine Distributors had achieved a 5% market share for the franchise products within their territories while similarly situated franchisees had only achieved 2% market share in other regions, the Distributors could suggest that they would lose this goodwill to their replacement franchisee. There is precedent for this type of showing. *Vineyard Brands*, 108 F. Supp. 2d at 864 (defendant winemaker established sub-par performance by its distributors at an evidentiary hearing on motion for a preliminary injunction). But the plaintiff distributors made no such showing here. Instead, the district court inferred that the Wine Distributors' history of distributing unidentified TWG products, including "several unique, high-velocity wines" engenders consumer goodwill that the termination would irreparably damage. Yet without any evidentiary support, that inference was speculative and inappropriate in any proper determination of irreparable harm. *Griepentrog*, 945 F.2d at 154.

Ohio's elected representatives have enacted and regularly reinforced a protectionist distribution statute, guaranteeing healthy profit margins and nearly irrevocable local monopolies to in-state distributors. Against this legislative solicitude for distributors, the district court could find that the Wine Distributors made a substantial showing of a likelihood of success on the merits by showing The Wine Group cancelled them without "just cause." *Esber Bev. Corp. v. Wine Grp., Inc.*,No. 2011CA00179, 2012 WL 983194 (Ohio Ct. App. March 19, 2012). Nevertheless, in the absence of sufficient evidence that preliminary relief was necessary to stave off irreparable harm, the district court should not have given injunctive relief until the case was fully presented. *E.g.*, *InBev USA, LLC v. Hill Dist. Co.*, No. 2:05-CV-298, ECF Doc. 60, at 2 (S.D. Ohio Sept. 7, 2006)

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

(awarding permanent injunction enjoining a brewer from terminating or altering franchise with distributor following summary judgment for distributor).

II.

By erring in finding irreparable harm, the district court abused its discretion in imposing a preliminary injunction. The four factors are not preconditions, and we deferentially review a district court's balancing of correctly determined factors for abuse of discretion. *Certified Restoration*, 511 F.3d at 541. However, an error of law or fact on the individual factors themselves is abuse of discretion. *See Charlesbank Equity Fund II v. Blinds To Go, Ltd.*, 370 F.3d 151, 158 (1st Cir. 2004) ("The trial court's discretion is not unbridled and "[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." (quoting *Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988)).

Regardless how certain that a movant is likely to succeed on the merits, we must weigh that determination against a correct evaluation of the threat of irreparable harm.

The majority reads *Mascio* for the proposition that this court can affirm a preliminary injunction on the basis the first factor alone, but that is only necessarily true where, as in *Mascio*, the likelihood of success was the only factor challenged on appeal. I do not read *Mascio* to end a district court's obligation to consider the second factor correctly, or to establish that a reviewing court does not properly disturb a district court's balancing of factors "where the district court relied upon clearly incorrect findings of fact." *Mascio*, 160 F.3d at 313.

III.

Finally and on a largely unargued point, the district court should not have sealed pleadings and exhibits without making constitutionally required findings to justify concealing court documents from the public. The public holds a qualified constitutional right of access to court documents that extends well beyond judicial opinions. The First Amendment access right extends to court dockets, records, pleadings, and exhibits, and establishes a presumption of public access that can only be overcome by specific, on-the-record findings that the public's interest in access to information is overcome by specific and compelling showings of harm. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986); *see also In re Application of Nat'l Broad. Co.*, 828 F.2d 340, 345 (6th Cir. 1987) (district court made inadequately specific findings that compelling interests favored closure). The right attaches to civil proceedings, *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695-96 (6th Cir. 2002), and constitutional standards apply not only to courtroom proceedings, but to dockets, pleadings, and documents attached to pleadings. *See Hartford Courant Co v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004); *In re New York Times Co. v. Biaggi*, 828 F.2d 110, 114 (2d Cir. 1987).

The sealing and protective orders issued here make none of the required findings. TWG moved to file its brief in opposition under seal, saying only that "[c]ertain documents attached as exhibits to and discussed in TWG's Brief are stamped 'Confidential.'" The next day a magistrate judge entered a four-line Order finding simply that "the motion sets forth good cause" and sealing the brief and exhibits. Simultaneously, the parties filed a joint proposed protective order providing that they will file self-designated confidential documents under seal. That proposed order was entered by a magistrate judge three days later, and the Wine Distributors promptly filed their reply,

No. 10-4202
*Tri-County Wholesale Distributors, et al v. The Wine Group, Inc.*

and several exhibits, under seal. The district court accomplished this without any specific findings of harm, without any balancing of the public's interest against the parties', and with no evident attempt at narrow tailoring. By way of showing the overbreadth of the sealed documents, it should suffice to note that among them is an Ohio trial court order.

The protective order is unconstitutionally overbroad and abdicates the court's responsibility to preserve the public's access right, which it effectively "turn[ed] over to the parties." *Proctor & Gamble Co v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) (vacating protective order). Beyond vacating the preliminary injunction, I would vacate the parties' stipulated protective order and permit the parties to move the district court for appropriate redactions.